UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| DAMARION BONDS, | |
| Plaintiff, | Case No. 25-cv-10904 |
| v. | Honorable Robert J. White |
| CENTRAL MICHIGAN UNIVERISTY, et. al., | |
| Defendant(s). | |

**OPINION AND ORDER GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION FOR ORDER TO APPEAR TELEPHONICALLY AS MOOT**

## I. Introduction

On July 22, 2025, Plaintiff Damarion Bonds, a division one collegiate basketball player, filed an amended complaint against Defendants Central Michigan University (CMU) and two of its school officials, Thomas Idema and Mary Martinez; and Rochester University (Rochester) and one of its school officials, Scott Samuels. The amended complaint alleges that Defendants at Rochester deprived him of his Procedural Due Process rights and rights under Title IX, among other things, when they conducted an investigation into assault allegations, and later found him in violation of the Student Code of Conduct. Then, Plaintiff transferred to Defendant

CMU, where he again raises claims related to violations of his Due Process Rights and rights under Title IX after this set of Defendants conducted a separate investigation, this time into whether Plaintiff had lied on his transfer application.

Before the Court is Defendants CMU, Idema and Martinez's motion for summary judgment, (ECF No. 37), and Defendants Rochester and Samuels' motion for summary judgment (ECF No. 38). Additionally, CMU, (ECF No. 18), and Idema and Martinez, (ECF No. 19), separately filed motions for judgment on the pleadings, which are still pending. And Plaintiff filed a motion for an order to appear telephonically, (ECF No. 34), which is also still pending. The Court will decide the motions without oral argument pursuant to E.D. Mich. LR 7.1(f)(2). For the following reasons, the Court will grant both motions for summary judgment and deny the remaining motions as moot.

## II. Background

### A. *Factual History*

Plaintiff Damarion Bonds attended Defendant Rochester—a private Christian university in Rochester Hills, Michigan—on a basketball scholarship during the 2022–2023 academic season. (ECF No. 11 at PageID.259).

In November of 2022, Plaintiff received an email notice (the "Notice") from a conduct officer at Rochester, informing him that the Center of Student Life had received information that he "may have violated sections of the *Rochester University*

*Student Code of Conduct*." (ECF No. 38-5, PageID.892 (emphasis in original). The

Notice specified the following sections that Plaintiff was accused of violating:

- **2.12 Residential Policies.** These additional policies are applicable only to students who reside in on campus housing at Rochester University
  - **a) Visitation:** A student found to be in any residence hall room or any unauthorized area with member(s) of the opposite sex, except at times approved by the Residence Life staff, as well as any violation of the Residence Life open house/visitation policy
- **4.2 Abuse.** Physical abuse, verbal abuse, threats, intimidation harassment, coercion, bullying, cyberbullying and/or other conduct which threatens or endangers the health or safety of any person.
- **4.4 Sexual Misconduct.** Includes, but is not limited to, sexual harassment, non-consensual sexual contact, non-consensual sexual intercourse, sexual exploitation, and stalking, and/or interpersonal violence.
- **4.6 Sexual Impropriety**
  - b) **Consensual Sexual Activity:** Consensual sexual activity includes, but is not limited to participation in, advocacy for, or appearance of engaging in premarital sex, extramarital sex, or other sexual expression that may conflict with the Christian identity or faith mission of Rochester University
  - **c) Possession, distribution, use or manufacture of pornographic materials including pornographic paraphernalia.**

(*Id.*) (emphasis in original).

The Notice informed Plaintiff that he was to attend an "Administrative

Student Conduct Meeting" with two conduct officers. (*Id.*) Plaintiff admits that he

attended the meeting, that they "explained to [him] what they had heard…basically explaining the situation that happened." (ECF No. 38-2, PageID.728–30).

At the same time, Defendant Samuels, the Title IX Coordinator at Rochester, received a Title IX complaint alleging that Plaintiff had sexually assaulted and harassed another student. (ECF No. 38, PageID.681). So, on November 14, 2022, Plaintiff was sent a letter from Defendant Samuels informing him that Rochester had received a formal Title IX complaint accusing him of sexual harassment and sexual assault. (ECF No. 38-6, PageID.895). The letter informed Plaintiff that, "[u]pon completion of the investigation, the Title IX coordinator or a designee will determine the available options for resolution and will communicate these options to all parties." (*Id.*)

But before the investigation could conclude, the Complainant withdrew from Rochester, so the complaint was dismissed as per Rochester's Title IX policy. (ECF No. 38, PageID.685).

Still, Rochester issued Plaintiff a Sanction Notice Student Conduct ("Sanction Notice") advising him that he had been found responsible for violations of the Student Code of Conduct. (ECF No. 38-7, PageID.897). In particular, Rochester found him in violation of the standards for "2.12 Residential Policies" concerning visitation in "unauthorized area with a member(s) of the opposite sex" and for "4.2

Abuse." (*Id.*) As a result of those findings, Plaintiff was assigned the following "conduct sanction(s)":

1. **Suspension from University Housing** – You are suspended from university housing for the 2023-24 academic year
2. **Rochester University Probation** – You are on probation for the 2023-24 academic year. Should further violations of Rochester University policies occur during the probationary period, you may face suspension or expulsion. Regular probationary meetings may also be imposed.

(*Id.*) (emphasis in original).

Additionally, the sanction notice indicated that Plaintiff had the right to appeal the sanctions, (*id.*), however, he did not do so. (ECF No. 38, PageID.686). Instead, he signed the Sanction Notice and transferred to Henry Ford College for the 2023-24 academic year to play basketball. (*Id.* at PageID.686 –87).

After that season, Plaintiff transferred to play basketball for Defendant CMU. (*Id.* at PageID.687). As part of CMU's transfer process, Plaintiff was required to respond to a series of questions about his educational history. (*Id.*) One question asked:

> "[f]or reasons involving academic dishonesty, financial impropriety, or *an offense that harmed or had the potential to harm others*, has any secondary school…taken any of the following actions against you: expulsion, *suspension, placed on a probationary period*, or other disciplinary action, or entered into an informal resolution resulting in disciplinary action with you?"

(ECF No. 38-8, PageID.900) (emphasis added) (hereinafter "Transfer Application Question"). Plaintiff responded "No." (ECF No. 38, PageID.687). In submitting his

application, Plaintiff certified that his application was complete and accurate, and that "withholding information requested…will make [him] ineligible for admission to CMU or subject to dismissal." (ECF No. 38-9, PageID.902).

He testified that he did not consider the Sanction Notice when answering the Transfer Application Question because he "literally honestly forgot about it." (ECF No. 38-2, PageID.750). However, he believes that he answered the Transfer Application Question correctly because he had transferred before the sanctions could take effect. (ECF No. 38-2, PageID.751). Regardless, Plaintiff was admitted to CMU in June of 2024. (ECF No. 38, PageID.688).

However, this was short lived. On October 15, 2024, CMU's Office of Civil Rights and Institutional Equity (OCRIE) was informed by CMU Athletics that Plaintiff had not completed the Previous Institution Verification Form (PIVF) as required by the National Collegiate Athletic Association's (NCAA) Sexual Violence Policy, for either Rochester or Henry Ford. (ECF No. 8-4 at PageID.98). Both the transfer athlete and a previous institution administrator complete the PIVF separately. (*See* ECF No. 8-5 at PageID.101). In one of the questions, the PIVF asked "[h]as the student been found responsible, in violation, or been disciplined through a Titel IX *or other sexual misconduct proceeding* or grievance process?" (ECF No. 38-10, PageID.904) (emphasis added). Plaintiff responded "No." (ECF No. 38-10, PageID.904). Plaintiff testified that he did not consider the Sanction Notice when he

responded to the PIVF because he "forgot about the whole situation because it literally was nothing." (ECF No. 38-2, PageID.754).

But Defendant Samuels, filling out the PIVF on behalf of Rochester, responded "Yes" to that same question, and attached a document informing CMU that the Title IX Coordinator for Rochester received a formal Title IX complaint implicating plaintiff, but that the Complainant had withdrawn from Rochester, so the complaint had been dismissed. (*Id.* at PageID.904–5).

The completed PIVF was provided to Defendant Martinez, CMU's Title IX Coordinator. (ECF No. 37, PageID.596–97). In reviewing the PIVF, Martinez spoke with Samuels who advised her about the Title IX investigation involving Plaintiff and further advised her that the facts gathered during that investigation led to the student conduct violation. (*Id.* at PageID.597). It was around this time that Martinez learned from CMU's admissions department that Plaintiff had responded "No" to the Transfer Application Question. (*Id.*)

Afterward, Martinez prepared a memorandum ("Martinez Memo") summarizing this information. (ECF No. 37, PageID.597). But, in part, and as pointed out often by Plaintiff, the Martinez Memo incorrectly states that there was a discrepancy between Plaintiff's and Samuel's answer for "question #2" which asked "[i]s this student currently subject to any Title IX or sexual misconduct investigation or grievance process that has not yet been completed?" (ECF No. 8-4, PageID.98).

However, the discrepancy between the answers was on question #1, which asked "[h]as the student been found responsible, in violation, or been disciplined through a Title IX or other sexual misconduct proceeding or grievance process?" (ECF No. 38-10, PageID.904). This relatively small misstatement is the crux of much of the Plaintiff's case.

As part of her recommendation, the Martinez Memo was forwarded over to Defendant Idema, the Director of CMU's Office of Student Conduct, for evaluation. (ECF No. 37, PageID.597). After reviewing the Martinez Memo, Idema began his own investigation which included reaching out to Rochester for additional materials and information, including the Sanction Notice. (*Id.*)

Next, written notice was sent to Plaintiff informing him that CMU's Office of Student Conduct had been notified about discrepancy in the information he had provided to CMU, and that he was being charged under CMU's "Code of Student Rights, Responsibilities and Disciplinary Procedures/3.2.2 False Information.[1]" (ECF No. 8-8, PageID.131). The written notice directed Plaintiff to attend a meeting

---

[1] Under CMU's Code of Conduct, section 3.2.2. governing false information reads: "A student shall not furnish, or attempt to furnish, false or misleading information to university officials or on official university records. Furthermore, a student shall not forge, alter, or misuse the university name, the name of any university employee, documents, records of identification, or attempt to do the same." (ECF No. 8-6, PageID.110).

with Idema, who would serve as the Conduct Proceeding Officer ("CPO"). (ECF No. 37, PageID.598).

During this meeting, Idema presented Plaintiff the Sanction Notice from Rochester and reiterated that he was being charged with violating CMU's Code of Conduct § 3.2.2. governing false information. (ECF No. 37, PageID.598). Idema also informed Plaintiff that he could be dismissed from CMU if found in violation of the Code of Conduct. (ECF No. 37-2, PageID.633).

Plaintiff chose to proceed to a hearing (ECF No. 37, PageID.599). Prior to the hearing, Plaintiff, his attorney, and the Hearing Body were provided copies of the Sanction Notice as well as the Transfer Application Question. (*Id.*) Plaintiff was not provided with the Martinez Memo.

At the November 22, 2024 hearing, Idema read the Martinez Memo into the record. (ECF No. 8-9, PageID.138–40). Additionally, Idema read the Transfer Application Question, and the Sanction Notice into the record. (*Id.* at PageID.140–42). In response, Plaintiff admitted at the hearing that he was suspended from Rochester's dorms, but that he "did not receive that it was a disciplinary action" and that he "just took [his] mind off of it because…[he] didn't get suspended from the school." (*Id.* at PageID.145). Further in his defense, Plaintiff argued that he didn't "answer the question wrong on purpose;" instead, he "really just didn't understand the question." (*Id.* at PageID.147). The hearing body did not buy these arguments.

In December of 2024, a written notice was sent to Plaintiff informing him that the Hearing Body had found him in violation of § 3.2.2 False Information. (ECF No. 8-10, PageID.168). In its reasoning, the Hearing Body found that Plaintiff had incorrectly responded "No" to the Transfer Application Question, despite the Sanction Notice from Rochester. (*Id.* at PageID.168–69). Accordingly, Plaintiff was dismissed from CMU. (*Id.* at PageID.169).

Plaintiff appealed the Hearing Body's decision to the Appeals Board pursuant to § 5.4 of CMU's Code of Conduct, but his dismissal was upheld. (ECF No. 37, PageID.602).

## B. *Procedural History*

Plaintiff filed his amended complaint with the Court on July 22, 2025. (ECF No. 11). He originally alleged several claims including (1) that Defendants Rochester, CMU, Samuels, Idema, and Martinez all violated his Fourteenth Amendment Procedural Due Process rights, (2) that CMU and Rochester both violated Title IX, (3) state law claims of injurious falsehood, negligence, promissory estoppel, intentional infliction of emotional distress against all Defendants, and (4) claims of breach of contract against both Rochester and CMU. (*Id.* at PageID.269–92). But later on the Parties stipulated to dismiss all claims against CMU besides the Title IX claim. (ECF No. 25). And, after that, the Parties stipulated to dismiss the

Title IX claims against Defendants Idema and Martinez. (ECF No. 32). A chart has been included to clarify which claims remain against which Defendants:

| Defendant: | Claims Asserted Against: |
|---|---|
| CMU | 1. Violation of Title IX |
| Idema | 1. Violation of Fourteenth Amendment Procedural Due Process under 42 U.S.C. § 1983<br>2. Injurious Falsehood<br>3. Negligence<br>4. Promissory Estoppel<br>5. Intentional Infliction of Emotional Distress |
| Martinez | 1. Violation of Fourteenth Amendment Procedural Due Process under 42 U.S.C. § 1983<br>2. Injurious Falsehood<br>3. Negligence<br>4. Promissory Estoppel<br>5. Intentional Infliction of Emotional Distress |
| Rochester | 1. Violation of Fourteenth Amendment Procedural Due Process under 42 U.S.C. § 1983<br>2. Violation of Title IX<br>3. Injurious Falsehood<br>4. Negligence<br>5. Promissory Estoppel<br>6. Intentional Infliction of Emotional Distress<br>7. Breach of Contract |
| Samuels | 1. Violation of Fourteenth Amendment Procedural Due Process under 42 U.S.C. § 1983<br>2. Injurious Falsehood<br>3. Negligence<br>4. Promissory Estoppel<br>5. Intentional Infliction of Emotional |

| | Distress |
|---|---|

On July 24, 2025, CMU filed a motion for judgment on the pleadings. (ECF No. 18). And Defendants Idema and Martinez filed their own motion for judgment on the pleadings five days later. (ECF No. 19). Then, in February of 2026, Plaintiff filed a motion for order to appear telephonically. (ECF No. 34). All three motions are still pending.

Then, on March 9, 2026, this case was transferred from Judge Ludington to the undersigned pursuant to Administrative Order 26-AO-009. Since then, Defendants CMU, Idema, and Martinez filed a motion for summary judgment. (ECF No. 37). Additionally, Rochester and Samuels filed a motion for summary judgment. (ECF No. 38). Both are currently before the Court.

## III. Legal Standards

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a summary judgment motion, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). A genuine, triable issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When analyzing the

motion, the Court "must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003)

## IV. Rochester and Samuels' Motion for Summary Judgment

Start with Defendants Rochester and Samuels' motion for summary judgment. The Court will grant the motion.

### A. Fourteenth Amendment Due Process Claim

Plaintiff argues that Rochester and Samuels violated his Fourteenth Amendment Procedural Due Process rights when it issued the Sanctions Notice. (ECF No. 11, PageID.269–71). But there is a threshold issue before the Court can address the merits of Plaintiff's claim.

Rochester is a private university, and Samuels is an employee of a private university. (ECF No. 38, PageID.694). Rochester and Samuels argue that, as private entities, they were not acting under the color of state law for the purposes of 42 U.S. Code § 1983. (*Id.*) "To state a claim under § 1983, "[t]he plaintiff must establish both that 1) [he] was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). Accordingly, if a plaintiff fails to make a showing on any essential element of a § 1983 claim, it fails. *Id.*

In the Sixth Circuit, there are three tests for determining the existence of state action in a case: "(1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir.1992)). Plaintiff believes that Rochester and Samuels' conduct satisfies the public functions test. (ECF No. 44, PageID.1002–04).

Under the public function test, a private party is a state actor if he exercises powers traditionally reserved exclusively to the state. *Chapman*, 319 F.3d at 833. "The public function test has been interpreted narrowly. Only functions like holding elections, exercising eminent domain, and operating a company-owned town, fall under this category of state action." *Id.* (internal citations omitted).

As Rochester and Samuels point out, the Sixth Circuit has been clear: "The weight of case law, both within and outside the Sixth Circuit, concludes that private colleges are not transformed into state actors while conducting Title IX investigations." *Doe v. Oberlin Coll.*, 60 F.4th 345, 354 (6th Cir. 2023) (collecting cases). And the facts found during the Title IX investigation led to the violations of Rochester's Student Code of conduct in the Sanctions Notice. (ECF No. 37, PageID.597).

Plaintiff argues that it is "not the Title IX complaint that ties Rochester's actions to that of a public function," but rather that "the Sanctions Notice exists as a

concluded criminal investigation with greater implications." (ECF No. 44, PageID.1003). However, the Sanctions Notice does not appear to have any criminal implication whatsoever. Regardless, Plaintiff argues that because one of the Student Code of Conduct violations, § 4.2 governing "Abuse," refers to acts that *could* result in a criminal prosecution, Rochester and Samuels must have been acting under color of law. (*See id.*) But this argument makes little sense. If all acts that *could* result in criminal actions became a predicate for state action at private universities, then *any* Title IX investigation would be state action. And it would greatly expand who is a private actor under the public functions test, which has been interpreted narrowly. *See Chapman*, 319 F.3d at 833. So, Plaintiff cannot show that Rochester or Samuels' conduct satisfies the public function test. Therefore, Plaintiff's Fourteenth Amendment claim against both fail.

### B. Title IX Claim

Next, turn to Plaintiff's Title IX claims against Rochester. He argues that Rochester violated Title IX when it treated Plaintiff differently because of his sex. (ECF No. 44, PageID.1006).

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance...." 20 U.S.C. § 1681(a). "Title IX is enforceable through a judicially

- 15 -

implied private right of action, through which monetary damages are available." *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001).

The Sixth Circuit has recognized four theories of liability that a student who is attacking a university disciplinary proceeding on grounds of gender bias can assert under Title IX. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). "These theories are: (1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions.'" *Id.* (quoting *Doe v. Cummins*, 662 F. App'x 437, 451–52 & n.9 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638–39 (6th Cir. 2003)). Plaintiff only argues a violation of Title IX under the erroneous outcome theory. (ECF No. 44, PageID.1006).

To plead an erroneous-outcome claim, a plaintiff must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized ... causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 F. App'x at 452 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). "A successful 'erroneous outcome' claim requires the plaintiff to show that the 'outcome of [the] University's disciplinary proceeding was erroneous because of sex bias.'" *Cummins*, 662 F. App'x at 452 (quoting *Mallory*, 76 F. App'x at 639). "Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent

- 16 -

university officials, or patterns of decision-making that also tend to show the influence of gender." *Miami Univ.*, 882 F.3d at 593 (quoting *Yusuf*, 35 F.3d at 715).

Plaintiff argues that the Sanction Notice demonstrates gender bias. (ECF No. 44, PageID.1006). He argues that Rochester's Code of Conduct prohibits any student, male or female, from being in a residence hall with a member of the opposite sex, yet he was the only one that received a sanction, and the "female 'accuser' of Plaintiff was not punished in any way, whatsoever." (*Id.* at PageID.1006–07). But the fact that, in this one case, the accuser did not herself receive a sanction, does not represent a "pattern of decision-making" that shows the influence of gender. Indeed, courts have held that "a single case by an individual who was displeased by the result of a disciplinary proceeding cannot constitute a pattern of decision-making." *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1070 (S.D. Ohio 2017), *reconsideration in part*, 323 F. Supp. 3d 962 (S.D. Ohio 2018) (quoting *Doe v. Case W. Rsrv. Univ.*, No. 1:14CV2044, 2015 WL 5522001, at *6 (N.D. Ohio Sept. 16, 2015)). At best, the fact that Plaintiff's accuser was not punished shows that Rochester may have been biased in favor of perceived victims, not gender. *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."). Additionally, Rochester may simply not have punished Plaintiff's accuser because she had already

withdrawn from the school by the time the Sanction Notice was issued. (ECF No. 38, PageID.685).

Regardless, Plaintiff has not met his burden of proving that the outcome of Rochester's disciplinary proceeding was erroneous *because* of gender bias. *Cummins*, 662 F. App'x at 452. Therefore, Plaintiff's Title IX claim against Rochester fails.

### V. CMU, Idema, and Martinez's Motion for Summary Judgment

Turn to Defendants CMU, Idema, and Martinez's motion for summary judgment. The Court will also grant this motion.

#### A. Fourteenth Amendment Procedural Due Process

Start with Plaintiff's Fourteenth Amendment Procedural Due Process arguments against Martinez and Idema. Defendants argue a familiar qualified immunity defense (1) that they did not violate Plaintiff's Procedural Due Process rights at his disciplinary hearing, and (2) that, even if they violated his constitutional rights, they are entitled to qualified immunity. (ECF No. 37, PageID.606–15).

Where applicable, qualified immunity protects government officials from civil liability. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). It applies to Plaintiff's § 1983 claims against Defendants unless their conduct violated Plaintiff's clearly established constitutional rights. *Finley*, 102 F.4th at 804 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard implicates two questions: (1)

Did Defendants' conduct violate Plaintiff's constitutional rights?; (2) If so, were the rights clearly established on the date of Plaintiff's hearing on November 22, 2024? *See Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). This Court can address these questions in any order, and "if the answer to either question is 'no,'" then Defendants are "entitled to qualified immunity." *Finley*, 102 F.4th at 804–05.

A plaintiff asserting a claim under 42 U.S.C. § 1983 against multiple individual defendants "must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citations omitted). If a plaintiff cannot show that a particular defendant is involved in a constitutional violation, that defendant is entitled to summary judgment. *Halasz v Cass City Pub. Schs.*, Case No. 1:25-cv-13158, 2025 WL 1490055 at *16, n 7 (E.D. Mich., May 23, 2025), *aff'd sub nom. Halasz v. Cass City Pub. Schs.*, 162 F.4th 724 (6th Cir. 2025). The Court will discuss each Defendant's liability in turn.

### a. Defendant Idema

### *i. Constitutional Violation*

Turn to the § 1983 Procedural Due Process claim against Defendant Idema. The Fourteenth Amendment due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST.

amend. XIV, § 1. Accordingly, to state a claim for a violation of Procedural Due Process, a plaintiff must first establish a constitutionally protected property or liberty interest. *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1074 (S.D. Ohio 2017), *on reconsideration in part*, 323 F. Supp. 3d 962 (S.D. Ohio 2018) (citing *Easley. Univ. of Mich. Bd. of Regents*, 627 F. Supp. 580, 582 (E.D. Mich. 1986)). "Procedural due process is 'implicated by higher education disciplinary decisions.' " *Miami Univ.*, 882 F.3d at 599 (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005)). And "suspension clearly implicates a property interest." *Cummins*, 662 F. App'x at 445 (citing *Jaksa v. Regents of Univ. of Mich.*, 597 F.Supp. 1245, 1247–48 (E.D. Mich. 1984)). Plaintiff had a constitutionally protected property interest in remaining a student at CMU.

Since the Court has determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). The Sixth Circuit has applied the factors from *Mathews v. Eldridge*, 424 U.S. 319 (1976) when addressing this question. " '[T]he specific dictates of due process generally require[] consideration of three distinct factors': (1) the nature of the private interest subject to official action; (2) the risk of erroneous deprivation under the current procedures used, and the value of any additional or substitute procedural safeguards; and (3) the governmental interest, including the burden any additional or substitute procedures

might entail." *Univ. of Cincinnati*, 872 F.3d at 399 (quoting *Mathews*, 424 U.S. at 334–35).

Turn to the first *Mathews* factor: the nature of Plaintiff's private interest at stake. But neither the Defendants nor Plaintiff address this factor. (*See generally* ECF No. 37; ECF No. 43). While Plaintiff may have had a substantial interest in remaining in good standing at CMU because he was a Division 1 athlete, and on an NCAA Student Athletic Scholarship, (ECF No. 11, PageID.259), since his expulsion, he has joined the Alabama State University Division 1 basketball team. (ECF No. 38-2, PageID.718–19). And, while the Sixth Circuit has found that a Title IX finding of responsibility for a sexual offense can have a " 'lasting impact' on a student's personal life, in addition to his 'educational and employment opportunities,' " that same reasoning has not been applied to suspensions arising outside of Title IX, like this case. *Univ. of Cincinnati*, 872 F.3d at 400 (quoting *Cummins*, 662 F. App'x at 446). Thus, this factor favors neither Party.

Turn to the second *Mathews* factor: the risk of an erroneous deprivation of Plaintiff's interest through the procedures used. At a minimum, the Sixth Circuit has stated that a student facing suspension[2] is procedurally entitled to "the opportunity

---

[2]  Defendants argue that Plaintiff's dismissal from CMU was "academic in nature," not based on disciplinary misconduct. (ECF No. 37, PageID.607). Where dismissals are academic in nature, the procedural requirements are noticeably lower. *See Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) ("Where dismissals

to be 'heard at a meaningful time and in a meaningful manner.' " *Cummins*, 662 F. App'x at 446 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The process for that hearing may vary, but the university must at least provide (1) "notice of the charges", (2) "an explanation of the evidence against the student", and (3) "an opportunity to present his side of the story before an unbiased decision maker." *Univ. of Cincinnati*, 872 F.3d 393, 399–400 (citing *Cummins*, 662 F. App'x  at 446). The Sixth Circuit has been clear that this hearing does not need to take on the formalities of a criminal trial. *Id.* at 400 (citing *Flaim*, 418 F.3d at 635).

Plaintiff alleges that he (1) did not have notice of the charges against him, (2) did not have an explanation of the evidence against him, (3) was unable to present

---

are considered academic in nature, procedural due process does not require a hearing before a decisionmaking body either before or after the termination decision is made."). While there is no bright-line test for determining whether a dismissal is academic or disciplinary in nature, court have held dismissals academic when (1) it rested on academic judgment of school officials, and (2) "is one that involves a school's consideration of a student's personal attributes requiring the 'expert evaluation ... and historic judgment of educators," and bear "little resemblance to ... judicial and administrative fact-finding proceedings.' " *Id.* at 875 (quoting *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89–90(1978)). "Disciplinary dismissals, on the other hand, involve 'the violation by a student of valid rules of conduct' or 'disruptive and insubordinate behavior.' " *Id.* (quoting *Horowitz*, 435 U.S. at 86, 90). Plaintiff's disciplinary hearing concerned charges of violating § 3.2.2 of CMU's Code of Conduct for providing "False Information," (ECF No. 11 at PageID.264), for which he was found in violation of, (*Id.* at PageID.266). Because Plaintiff's charges related to alleged violations of a university code of conduct, the Court concludes that Plaintiff's dismissal was based on disciplinary misconduct and was not "academic in nature."

his case before an unbiased decision maker, and (4) that he should have been allowed to cross-examine "Martinez, Young[3], or even the PIVF or Samuels Letter.[4]" (ECF No. 43, PageID.950–51).

*Notice*. Start with Plaintiff's arguments that he did not receive proper notice. He argues that he should have been made aware of the Martinez Memo so that he could be "readily able to challenge the Admissions Charge accordingly." (ECF No. 43, PageID.950). But the notice prong only requires that he be provided notice "of the charges," *Univ. of Cincinnati*, 872 F.3d at 399, and it is undisputed that Plaintiff received both written notice that he was being charged with violations of § 3.2.2. False Information, (ECF No. 8-8, PageID.131), and in person at his meeting with Defendant Idema, (ECF No. 38-2, PageID.760–61). "Notice satisfies due process if the student 'had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing.' " *Flaim*, 418 F.3d at 638 (quoting *Jaksa v. Regents of Univ. of Michigan*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984), *aff'd*, 787

---

[3] Patricia A. Young is the Director of Undergraduate Recruitment/Admissions at CMU. (ECF No. 43, PageID.938). While unclear from Plaintiff's brief, seemingly he wished to cross-examine Young about a comment she made to Defendant Idema: "…the one thing that Mary [Martinez] and I talked about is that the phrasing of the question technically doesn't mention anything about college housing (so I have a meeting later this week to talk to the admissions team so we can consider how its worded)." (*Id.*)

[4] Seemingly, the "Samuels Letter" refers to the letter Samuels attached to the PIVF form he filled out. (ECF No. 8-5, PageID.102)

F.2d 590 (6th Cir. 1986)). The notice provided to Plaintiff clearly did so. Therefore, he had proper notice of the charges against him.

***Explanation of the evidence against him***. Plaintiff argues that he did not have explanation of the evidence against him because he was not given the Martinez memo, the PIVF as completed by Samuels, the Samuels Letter, or the communication between Young and Idema. (ECF No. 43, PageID.951). The Sixth circuit has stated that students have a constitutional requirement that they be provided the evidence against them. *Miami Univ.*, 882 F.3d at 603 (citing *Univ. of Cincinnati*, 872 F.3d at 399–400). So to the extent that either the Martinez Memo, the PIVF, or the Samuels Letter was used by the Hearing Body to adjudicate Plaintiff's charge, and Plaintiff was not provided this evidence beforehand, he has stated a cognizable due-process violation. *See id.* ("to the extent any of the evidence contained within this report was used by the Administrative Hearing Panel to adjudicate [plaintiff's] claim, and [plaintiff] was not provided this evidence, he has alleged a cognizable due-process violation.").

But it is undisputed that Plaintiff, his attorney, and the Hearing Body all received copies of the Sanction Notice as well as the Transfer Application Question.

(ECF No. 37, PageID.599). And Daniel Segura, the University Hearing Officer[5] on the Hearing Body, stated in an undisputed affidavit that the Hearing Body came to a unanimous decision that Plaintiff had violated § 3.2.2 of the Student Code of Conduct because (1) Plaintiff had received the Sanction Notice from Rochester, (2) Plaintiff acknowledged at the hearing that (in light of the Sanction Notice) his answer to the Transfer Application Question was incorrect, and (3) that Plaintiff still answered "No" to the Transfer Application Question. (ECF No. 37-5, PageID.662–63). The letter Plaintiff received concerning the Hearing Body's findings reflects the same reasoning. (ECF No. 8-10, PageID.168–69). Neither Segura's affidavit, nor the letter mention the Martinez Memo, the PIVF as completed by Samuels, the Samuels Letter, or the communication between Young and Idema. (*See generally* ECF Nos. 37-5; 8-10). So the Court concludes that the Hearing Body did not use them in determining whether Plaintiff had violated § 3.2.2 of the Student Code of Conduct, and he was provided sufficient explanation of all relevant information against him.

***Unbiased decision maker***. Plaintiff argues that he was unable to present his case before an unbiased decision maker because Defendant Idema "displayed his bias" at the hearing when he stated it was his opinion that Plaintiff had been

---

[5] CMU's Student Code of Conduct tasks the University Hearing Officer with determining "whether the student charged violated the student conduct regulations," and sets the sanction, when applicable. (ECF No. 8-6, PageID.122)

disciplined by Rochester, and because he "instruct[ed] the Hearing Panel to disregard the Sanction Notice." (ECF No. 43, PageID.951). Plaintiff is incorrect in both instances.

First, Defendant Idema was not one of the decision makers on the Hearing Body; instead, he was the CPO. (ECF No. 37, PageID.598). CMU's Code of Conduct requires the CPO to (1) make an investigation into a charge against a student, (2) determine if a matter may be a reason for discipline, (3) and notify the student of the charge and provide an opportunity for discussion. (ECF No. 8-6, PageID.119). Rather, it is the University Hearing Officer, along with two students who round out the CMU Hearing Body, who determine whether the student charged violated CMU's Student Code of Conduct and sets the sanction for that violation. (ECF No. 8-6, PageID.122).

Second, Defendant Idema does not appear to be talking about the Sanction Notice when he said at Plaintiff's hearing: "I would just point out that that's not really relevant to what we're talking about today." (ECF No. 8-9, PageID.157). Rather it appears to be in response to an argument Plaintiff was making that the female accuser at Rochester "made several complaints about several boys at the school." (*Id.*) Regardless, Defendant Idema's statements cannot show bias of the decision maker: the Hearing Body.

In the Sixth Circuit, "[i]t is also well established that school-disciplinary committees are entitled to a presumption of impartiality, absent a showing of actual bias." *Cummins*, 662 F. App'x at 449. Plaintiff has not presented evidence that the Hearing Body was impartial to him or biased.

***Cross-examination of the witnesses against him.*** Finally, Plaintiff argues that the CMU disciplinary proceedings were "flawed" because he didn't have the opportunity to cross-examine Defendant Martinez, Young, "or even the PIVF or Samuels Letter." (ECF No. 43, PageID.951).

The Sixth Circuit has said that accused students must have the right to cross-examine adverse witnesses "in the most serious of cases." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005). In *Flaim*, the Sixth Circuit explained that the most serious of cases entails when a case "resolve[s] itself into a problem of credibility." 418 F.3d at 641 (quoting *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir.1972)). But where, as in *Flaim*, the cross examination would have been a "fruitless exercise" because a student admitted to the "critical facts," cross-examination is unnecessary. *See id.*

Here, the cross-examination would have been unnecessary. Plaintiff admitted to the Hearing Body that he was suspended from Rochester's dorms, but that he "did not receive that it was a disciplinary action" and that he "just took [his] mind off of it because…[he] didn't get suspended from the school." (ECF No. 8-9, PageID.145).

Further in his defense, Plaintiff argued that he didn't "answer the question wrong *on purpose*;" instead, he "really just didn't understand the question." (*Id.* at PageID.147) (emphasis added). Therefore, Plaintiff's admission made cross-examining any witness irrelevant.

At bottom, Plaintiff received all necessary procedural protections. This factor clearly favors Defendant Idema.

Turn to the final *Mathews* factor: the Government's interest. However, neither Party tries to address this factor. (*See generally* ECF Nos. 37; 43). Therefore, it favors neither party.

In sum, the weight of the *Mathews* factors demonstrate that Plaintiff was provided all procedural protections afforded by the Fourteenth Amendment Due Process Clause. Thus, Plaintiff has suffered no constitutional violation.

### ii. Clearly Established

Even if Defendant Idema had violated Plaintiff's Procedural Due Process rights, he is entitled to qualified immunity because the conduct Plaintiff argues was unconstitutional was not clearly established as such in November of 2024. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). This standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v.*

*Wesby*, 583 U.S. 48, 63 (2018). And plaintiffs bear "the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

To meet their burden, plaintiffs must show that existing law places the "official's conduct 'beyond debate' such that any reasonable official would understand that [his] conduct was unlawful." *Finley*, 102 F.4th at 808 (cleaned up). Generally, this means plaintiffs must provide an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell*, 37 F.4th at 367–68. And "[b]ecause unpublished cases are nonbinding, 'a plaintiff cannot rely on an unpublished decision to meet his burden' of showing that a right is clearly established." *Ennes v. Presque Isle Cnty.*, 773 F. Supp. 3d 400, 420 (E.D. Mich. 2025) (quoting *Bell*, 37 F.4th at 367)).

Plaintiff argues that "the Supreme Court and Sixth Circuit's long precedent in requiring the right of procedural due process in disciplinary matters" clearly establishes that Defendant Idema's conduct was unconstitutional. (ECF No. 43, PageID.952). But Plaintiff has not presented any sufficiently on-point case to demonstrate that Defendant Idema's conduct deprived him of any of the procedures required by the Due Process Clause.

Plaintiff cites three cases: *Goss v. Lopez*, 419 U.S. 565 (1975); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017). (ECF No. 43, PageID.952). None of these cases clearly establish that Defendant Idema's conduct was unconstitutional.

Start with *Goss*. In *Goss* nine students challenged their suspension from public high schools in Ohio because they were suspended without a hearing. 419 U.S. at 567–69. The Supreme Court held that the students were entitled to "the necessary notice and rudimentary hearing" before suspension, *id.* at 582, and deemed their suspensions invalid, *id.* at 584. But *Goss* is not factually analogous to Plaintiff's case because it does not concern university disciplinary proceeding, and, even if it did (as noted before), Plaintiff did receive notice and a hearing before his suspension. (ECF No. 8-8, PageID.131; ECF No. 37, PageID.599). So *Goss* cannot clearly establish Defendant Idema's conduct as unconstitutional.

Next turn to *Flaim*. In *Flaim*, the plaintiff, a third-year medical student, was charged with several counts of Aggravated Possession of Drugs, Possession, and Drug Abuse in Ohio. 418 F.3d at 632. A grand jury indicted him, and he pleaded guilty to a lesser offense and was sentenced to probation. *Id.* The plaintiff was advised that he was not permitted to return to campus until he participated in an internal investigation regarding the conduct that gave rise to the criminal charges. *Id.* Later, the plaintiff received a written notice that he was to appear before the

medical school's Student Conduct and Ethics Committee to answer questions regarding his arrest. *Id.* at 632–33. At the hearing, the plaintiff's arresting officer testified and the committee members were allowed to ask the officer questions, however, neither the plaintiff nor his attorney were allowed to ask the officer questions. *Id.* at 633. The plaintiff was later expelled. *Id.*

As relevant to Plaintif's case, in *Flaim* the plaintiff argued that the notice he received was insufficient. But the Sixth Circuit found the notice the plaintiff received to be adequate, concluding that the Due Process Clause only requires "sufficient notice of the charges ... and a meaningful opportunity to prepare for the hearing." *Id.* at 639 (quoting *Jaksa*, 597 F.Supp. at 1250). The court held that "a comprehensive listing of evidence, witnesses, and copies of all documents intended to be produced" were not necessary to satisfy notice. *Id.* And, like *Flaim*, Plaintiff received sufficient notice of the charges against him and had an opportunity to prepare for his hearing. (ECF No. 8-8, PageID.131). So *Flaim* does not clearly establish that Plaintiff received insufficient notice from Defendant Idema.

Additionally, the Plaintiff in Flaim argued that he should have been able to cross-examine his arresting officer. *Flaim*, 418 F.3d at 641. Here, the court noted that only "[i]f a case 'resolve[s] itself into a problem of credibility, cross-examination of witnesses might ... be[ ] essential to a fair hearing.' " *Id.* (quoting *Winnick*, 460 F.2d at 549). But the Sixth Circuit concluded that cross-examination

would be "fruitless," because the "critical fact" in the plaintiff's case was conceded. *Id.* (quoting *Winnick*, 460 F.2d at 550). And, as explained before, Plaintiff admitted the critical fact that he lied on the Transfer Application Question. (ECF No. 8-9, PageID.145–47). Therefore, like the plaintiff in *Flaim*, he was not entitled to cross-examine any witnesses against him, if there were any. Thus, this case does not clearly establish that Defendant Idema's conduct was unconstitutional.

Lastly, turn to *Univ. of Cincinnati*. In this case, two students at the University of Cincinnati met online, engaged in a sexual relationship, and then the female student reported to the university's Title IX office that the male student had assaulted her. *Univ. of Cincinnati*, 872 F.3d at 396. The university set up a hearing, however, the university's hearing requirements in its code of conduct did not require witnesses against the accused to be present at the disciplinary hearing. *Id.* at 397. Here, the female accuser did not show up to the hearing and the male student was unable to cross-examine her. *Id.* at 397–98. However, a statement from the accuser was read into the record, to which the male student was invited to respond. *Id.* at 398.

The Sixth Circuit reiterated the rule in *Flaim*: "If a case 'resolve[s] itself into a problem of credibility, cross-examination of witnesses might ... be[ ] essential to a fair hearing.'" *Id.* at 401 (citing *Flaim*, 418 F.3d at 641). And , as noted in the Court's analysis of *Flaim*, Plaintiff admitted his misconduct in front of the Hearing Body. (ECF No. 8-9, PageID.145–47). So this case, too, does not clearly establish

- 32 -

Defendant Idema's conduct as unconstitutional. Thus, Defendant Idema is entitled to qualified immunity.

### b. Defendant Martinez

Turn to the § 1983 Procedural Due Process claim against Defendant Martinez.

But there is an issue: Defendant Martinez only compiled the information in the Martinez Memo after CMU's OCRIE was informed by CMU Athletics that Plaintiff had not completed his PIVF. (ECF No. 8-4 at PageID.98). She argues that she did not participate in the disciplinary proceedings against Plaintiff. (ECF No. 37, PageID.606). Indeed, the record shows that she only referred the question of whether Plaintiff provided false information over to the university's Office of Student Conduct. (ECF No. 11 at PageID.264). There is no evidence in the record that she participated in Plaintiff's hearing. Plaintiff has little response to this argument, only claiming that it is "belied by the facts." (ECF No. 43, PageID.950).

But he does not allege in his Amended Complaint that Defendant Martinez commenced the proceedings against him. Instead, he only pleaded that Defendant Martinez "referred" the question of whether Plaintiff provided false information to CMU over to the Office of Student Conduct, (ECF No. 11, at PageID.264), far from commencing the disciplinary hearing herself.

CMU's Code of Conduct puts the onus on the Conduct Proceedings Officer (Defendant Idema) to (1) make an investigation into a charge against a student, (2)

determine if a matter may be a reason for discipline, (3) and notify the student of the charge and provide an opportunity for discussion. (ECF No. 8-6 at PageID.119).

The Sixth Circuit has noted that "a § 1983 plaintiff generally must prove both that a defendant was *personally* at fault and that the defendant's culpable conduct (not somebody else's) *caused* the injury." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 490 (6th Cir. 2020) (emphasis in original). That's because a Defendants' liability at common law would only result from their "own neglect," not from an "associate's neglect." *Id.* (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018) (citation omitted). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). So, each Defendant must be personally involved in the unconstitutional action. *Pineda*, 977 F.3d at 490 (quoting *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013)) (citation omitted). And "[p]roximity to a wrongdoer does not authorize punishment." *Id.* (quoting *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992)).

Plaintiff has not proven Defendant Martinez's involvement in his disciplinary proceedings. Thus, the Court will go no further on the Procedural Due Process Claims against Defendant Martinez, and that claim will be dismissed against her.[6]

## B. Title IX Claims

Next, turn to the Title IX claims against Defendant CMU. As explained before, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance...." 20 U.S.C. § 1681(a). And again, Plaintiff asserts that a violation of Title IX under the erroneous outcome theory.[7] (ECF No. 43, PageID.954).

First, Plaintiff argues that the Martinez Memo "exhibits clear gender bias." (ECF No. 43, PageID.954). He argues that Defendant Martinez must have "automatically assumed the Sanction Notice to be derived from the title IX complaint." (*Id.*) Confusingly, if this were true, Plaintiff asserts that Defendant Martinez could only reach this conclusion "due to gender bias and an assumption

---

[6] Even if Defendant Martinez had been involved in Plaintiff's disciplinary proceeding, she would still be entitled to qualified immunity for the same reasons as Defendant Idema.

[7] The standards to prove an erroneous outcome claim and the allegations that may be used to demonstrate one have already been explained by the Court when addressing the Title IX claims against Defendant Rochester.

that [Plaintiff] (a male) was automatically responsible for a sexually related violation…given the existence of the previous Title IX complaint at Rochester." (*Id.* at PageID.955). But the Martinez Memo was created by Defendant Martinez, and, as explained before, she had nothing to do with Plaintiff's disciplinary proceedings. So the Martinez Memo cannot be considered a statement by a "member[s] of the disciplinary tribunal" or a "pertinent university official[]." *Miami Univ.*, 882 F.3d at 593.

Second, Defendant Martinez did not "automatically assume" that the Sanctions Notice was related to the Title IX investigation at Rochester. The Martinez Memo indicates that, after Plaintiff and Rochester each completed their respective sides of the PIVF, there was a discrepancy between Plaintiff and Rochester's answers about whether Plaintiff had been subject to a Title IX investigation. (*See* ECF No. 8-4, PageID.98). So Defendant Martinez "spoke" with Rochester's head of Title IX, Samuels, and learned (1) that the "Title IX complaint at [Rochester] involved allegations of Dating Violence and Sexual Assault", (2) that, while the Title IX investigation was never completed, the facts gathered led to "student conduct violations" and "imposed sanctions on [Plaintiff]", and (3) that Plaintiff was eventually suspended from university housing as part of these sanction. (*Id.*) This means that Defendant Martinez had knowledge directly from Rochester and their Title IX office that the sanctions imposed in the Sanctions Notice were because of

the Rochester Student Code of Conduct violations, not because of the Title IX complaint.

Finally, even if Defendant Martinez did not know this information, the fact that she *might* have assumed that the sanctions within the Sanctions Notice were a punishment under the Title IX complaint, not because of the Code of Conduct violation, it would not be indicative of a 'particularized ... causal connection between the flawed outcome and gender bias.' " *Cummins*, 662 F. App'x at 452 (quoting *Yusuf*, 35 F.3d 715). At best, Plaintiff is making a guess that Defendant Martinez *might* have some form of gender bias, and that gender bias *might* have impacted his disciplinary proceedings. This guesswork is far too attenuated to show a particularized, causal connection between the alleged flawed outcome and gender bias.

Plaintiff also argues that Segura, the Hearing Officer of the Hearing Body, was biased. (ECF No. 43, PageID.955). Plaintiff cites one statement from Segura: "A Title [IX] investigation was not completed because the complainant left Rochester. So it sounds like it may not have been a consensual situation." (*Id.*) (quoting ECF No. 8-9, PageID.156). Plaintiff asserts that "[t]he assumption of no consent" is because he is a male, because of the Title IX complaint at Rochester, and because of the Sanctions Notice. (*Id.*)

But the erroneous outcome test requires plaintiffs to draw distinctions between victim/perpetrator and male/female bias: "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (citations omitted). At best, Segura's statement demonstrates a bias towards victims and against perceived perpetrators, not against males. Without more, Plaintiff cannot demonstrate a gender-based in the Hearing Body's findings. Thus, Plaintiff's title IX claim against CMU fails, and, because no claims remain against CMU, they will be dismissed as a Defendant.

### V. Conclusion

The only remaining claims against any of the Defendants arise under state law. So the Court will decline supplemental jurisdiction over those claims. *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–1255 (6th Cir.1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."). Therefore, because no claims remain, all Defendants are dismissed and so is the case.

Additionally, the two Motions for Judgment on the Pleadings, (ECF Nos. 18; 19), and Plaintiff's Motion for Order to Appear Telephonically, (ECF No. 34), will all be denied as moot.

Accordingly, it is **ORDERED** that Defendant Rochester University and Scott Samuels' motion for summary judgment, (ECF No. 38), is **GRANTED**.

Further, it is **ORDERED** that Defendant Central Michigan University, Thomas Idema, and Mary Martinez's motion for summary judgment, (ECF No. 37), is **GRANTED**.

Further, it is **ORDERED** that the Court declines to exercise supplemental jurisdiction over the remaining state law claims, so those claims are **DISMISSED**.

Further, it is **ORDERED** that all Defendants and the case are **DISMISSED**.

Further, it is **ORDERED** that Central Michigan University's motion for judgment on the pleadings, (ECF No. 18), is **DENIED AS MOOT**.

Further, it is **ORDERED** that Thomas Idema and Mary Martinez's motion for judgment on the pleadings, (ECF No. 19), is **DENIED AS MOOT**.

Further, it is **ORDERED** that Plaintiff Damarion Bonds' motion for order to appear telephonically, (ECF No. 34), is **DENIED AS MOOT**.

**This is a final order and closes the case.**

Dated: May 18, 2026                              s/Robert J. White
                                                 Robert J. White
                                                 United States District Judge